# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DREW WELBOURN, ) | CASE NO. |
| 221 DOUGLAS STREET ) | |
| MANCHESTER, NH 03102, ) | |
| ) | |
| PLAINTIFF, ) | |
| ) | |
| v. ) | |
| ) | |
| ROLLER WORLD, INC. ) | |
| 425R BROADWAY ) | |
| SAUGUS, MA 01906, ) | |
| ) | |
| GERALD T. BREEN, individually and as trustee ) | |
| CORTINA REALTY TRUST ) | |
| 425R BROADWAY ) | |
| SAUGUS, MA 01906 ) | |
| ) | COMPLAINT |
| DEFENDANTS, ) | |
| JOINTLY AND SEVERALLY. ) | JURY TRIAL REQUESTED |

FILED IN CLERKS OFFICE
U.S. DISTRICT COURT DISTRICT OF MASS.
2021 JUL 19 PM 12:42

## COMPLAINT

Drew Welbourn complains against Roller World, Inc. and Gerald Breen, personally and as co-trustee of Cortina Realty Trust, for multiple displaced, comminuted fractures (at least 8 bone fragments) to his left tibia and fibula while roller skating on the Defendants' defective and negligently maintained skate rink

Defendants have demonstrated a pattern of conduct of total indifference to Welbourn's injury and requests for evidence preservation and insurance information. Therefore, Plaintiff is now compelled to file this civil action.



*Fig 1. Welbourn's lower left leg, approx. three months after surgery.*

## PARTIES

1. Drew Welbourn ("Welbourn") is a 36-year-old citizen of New Hampshire. Prior to September 2020, Welbourn was a controller for Yotel Hotels in Boston, MA and then Radisson Hotel in Nashua, NH. Before moving to New England, Welbourn was a controller at the Plaza Hotel, in New York City. While in hotel finance, Welbourn completed a computer science degree from the University of Illinois at the end of 2020.

2. Roller World, Inc. ("Roller World") is a Massachusetts corporation with its principal place of business in Saugus, Massachusetts.

3. Gerald Breen is a citizen of Massachusetts.

4. According to the records of the Commonwealth of Massachusetts Corporations Division, Gerald Breen ("Breen") is Roller World's current Chief Executive Officer. Breen is Roller World's current resident agent, with a registered address as Roller World's principal place of business.

5. Cortina Realty Trust ("Cortina Realty") is a Massachusetts trust with three co-trustees, including Gerald Breen. Cortina Realty's principal place of business is the same as Roller World's principal place of business.

6. By respondeat superior, Roller World has vicariously liability for the actions and inactions of its officers, employees, and agents in the furtherance of Roller World's business.

7. Knowledge possessed by Roller World's officers, employees, and agents is imputed to Roller World.

8. Cortina Reality owns the premises from which Roller World, Inc. operates.

9. As trustee of Cortina Realty, Breen's knowledge is imputed to Cortina Realty.

10. Because of these positions, knowledge that Breen had or should have had about dangerous conditions on the roller rink premises are imputed to Cortina Realty.

11. Service of process upon Roller World's registered agent, Gerald Breen, effects service of process and provides actual notice of this suit upon at least one trustee of Cortina Realty.

## JURISDICTION AND VENUE

12. Personal jurisdiction is proper in this Court because Roller World, Inc., Breen, and Cortina Realty Trust are a Massachusetts corporation, individual, and a trust, respectively, with their principal places of business at the same location in Saugus, Massachusetts.

13. Subject matter jurisdiction is proper in this Court, because the parties are diverse and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332.

14. Venue is proper in this Court because a substantial amount of the events or omissions giving rise to the suit occurred within this Court's judicial district. 28 U.S. Code § 1391(b)(2).

## BACKGROUND

### The Premises

15. Roller World's premises include two rinks: (1) a small 'practice' rink, and (2) a larger general rink. Both skate surfaces are composed of cedar strips with a cement underlay.

16. Skate rinks require continual maintenance and cleaning to prevent unsafe skate conditions.

17. To avoid the risk of serious injury to invitees, a skate rink operator must regularly remove debris and foreign objects from the skate surface.

18. The industry best-practice is to sweep debris from the rink surface at least hourly, which can be conducted while patrons are skating. Roller World does not clean debris from its rink during skate sessions.

19. Even during skate conditions, to avoid foreign objects and debris, skate surfaces must be periodically swept or cleaned to prevent unsafe conditions from forming.

20. In the past, Roller World's premises have suffered serious flooding and water damage.

21. Parts of the main rink are suffering from warping, uneven wear, and delamination.

22. Foreign metal and plastic objects--overwhelmingly broken pieces Roller World's rental inline skates--regularly collect on the skate rink.

23. During multi-hour skate sessions, Roller World does not remove foreign debris from the skate surface.

24. During skate sessions, Roller World dims the interior lighting making it harder for invitees to view debris or hazards on the skate surface.

25. Small metal and plastic debris and poorly maintained floors are not open and obvious dangers to invitees like Welbourn who should reasonably expect a safe surface and rely on a rinker operator to provide a safe skate surface.

26. When traveling at low speed on a smooth and safe skate surface, a skilled skater typically does not fall or stop abruptly.

27. When a skater ordinarily falls, they typically lose their balance and then strike the ground, and the impact to the ground causes injury.

### "Let's go skating!"

28. Welbourn is an experienced skater. He has skated for many years of his life including playing roller hockey. He has never suffered serious injury of any kind while skating.

29. Welbourn's friend, Pamela Savino ("Savino") wanted to learn to roller skate. In early 2021, Welbourn and Savino skated at three roller rinks in New England and on a paved rail-trail.

30. Savino purchased two adult tickets for an adult skate session at Roller World's rink in Saugus, MA for Sunday evening of March 21, 2021.

31. Roller World's terms of sale and admission do not include any provision concerning a liability waiver. Roller World does not make visitors sign a separate liability waiver.

32. Roller World did not ask Welbourn to sign a liability waiver before using the roller rink.

33. Welbourn did not waive any liability against Defendants.

34. A sign which states "skate at your own risk" asserts that invitees assume all risk of injury.

35. The Commonwealth of Massachusetts has expressly abolished the affirmative defense of assumption of the risk. *See* MA Gen L ch 231 § 85.

36. A skater does not assume the risks of injury inherent in rollerskating when a roller rink operator fails to exercise reasonable care in the maintenance or cleaning of the premises.

37. On March 21, 2021, prior to using the Roller World, Welbourn's inspected his roller skates (including wheels, laces, bearings, and brake) for mechanical defects. Welbourn's roller skates had no observable mechanical defects.

### The Injury: A Sudden Stop--Not the Fall--Breaks Welbourn's Leg

38. At about 9:15 PM, Welbourn was skating at a low speed in a straight line on the long stretch of the larger rink.

39. Without warning, Welbourn felt his left leg abruptly stop moving and his right side twisted forward. While still upright, Welbourn saw and felt that his left leg had broken.

40. Then, Welbourn collapsed to his right side, rolled onto his right side, and did not move. Welbourn was in excruciating pain and unable to stand.



*Fig 2. Plaintiff waiting for EMS, biting his thumb in pain.
Note: visible water stains to rink floor.*

41. Savino was skating approximately 10 feet behind Welbourn when the injury happened.

42. Savino did not observe that Welbourn simply lost his balance.

43. Savino saw that "everything was fine" and then it appeared like Welbourn "hit a rock or something" and then collapsed to the right "sideways and diagonally."

44. At the time of the incident, no Roller World employers were on the skate floor. No Roller World employees saw the injury or fall occur. If an employee were sitting in the management office, the view to the location of the injury would be physically obstructed.

45. Savino immediately stopped and took her skates off while on the skate rink. She waved both arms for help from the Roller World staff. Another customer stopped to see if Savino or Welbourn needed help. The customer skated to get help.

46. Several minutes later, an unknown Roller World staff member walked onto the rink. Savino asked, "Did you call 9-1-1?" The staff member replied, "Yes." Then, the staff member dialed 9-1-1.

47. While waiting, a young Roller World employee told Savino that another customer was sent to the emergency room earlier that evening for breaking his hand.

48. Welbourn was on the roller rink service for about an hour until EMTs removed him. *Fig 3. Plaintiff on floor of rink, left leg showing visible broken-bone bend at ankle.*

### Medical Treatment: Surgery and a Nine-Day Hospital Stay

49. EMTs transported Welbourn by ambulance to Melrose-Wakefield Hospital.

50. Diagnostic x-rays showed Welbourn had at least 8 fractures to his left tibia and fibula.

51. One treating nurse said it was the worst leg fracture she had seen and that the x-ray made her want to vomit.

52. A comminuted fracture means that the break has resulted in *at least* three bone fragments.

53. In adults, fractures to the lower third of the are generally take longer to heal and have longer recovery times.

54. The fractures include a displaced, comminuted fracture to the lower third of the left tibia.

55. The fractures include a displaced, comminuted fracture to the lower third of the left fibula.

56. Drew has at least 8 bone fragments, meaning a worse injury, and a longer recovery time.

57. The location and type of fractures suggest to a reasonable degree of medical certainty that Drew's left leg came to a sudden stop, and the right side of his body kept traveling in a straight line. This caused twisting and sheer forces on his tibia and fibula.

58. This kind of bone fracture is observed in skating injuries, because the presence of skates places an extra stabilizing force on the foot and ankle.



*Fig 3. A skate-related, single fracture (to tibia only).*
*Plaintiff suffered multiple fractures to both tibia and fibula.*

59. In Welbourn's case, rather than a clean spiral fracture, the fracture exploded into even smaller bone fragments. Welbourn's physician assistant called it a "spiral fracture plus."

60. Treating a comminuted fracture is usually more complicated than treating other types of fractures because the damaged bone is broken into three or more pieces. A simple resetting of the bone is not usually possible, as it is with other less-serious fractures.

Treatment usually involves surgery. The surgeon places internal stabilizers, such as screws or metal plates, into the broken pieces to keep them in place. After surgery, an extended period of immobilization is necessary to allow the bone to heal.

61. Welbourn was admitted for surgery. However, he languished in pain through Sunday night, Monday, and Tuesday before surgeons could operate.

62. During surgery, a titanium rod was inserted into Welbourn's left leg from above the knee and down into his lower leg, causing permanent scarring.

63. The titanium rod was drilled into Welbourn's bones with five titanium screws. These foreign metal objects are permanent for the rest of Welbourn's life.

64. Due to the severity of the fractures, Welbourn was in the hospital for a total of nine days.

65. Welbourn's surgeon instructed Welbourn not to place any body weight on his left leg for at least 3 minimum, but perhaps closer to 6 months. Welbourn's doctor warns that recovery could take a year or longer. The injury and its outcome are a lifelong injury.

66. Welbourn has had to use a wheelchair and a walker during his recovery.

67. He has been largely bed-bound. Welbourn's left leg is to remain elevated. If Welbourn's leg does not remain elevated, it quickly swells and turns purple from edema.

68. As a further complication, Welbourn is no longer able to put his left foot flat on the ground.

69. Welbourn's doctor warns that a second surgery may be necessary on Welbourn's ankle.

70. Welburn is dreading and has great anxiety over the prospect of another surgery, its cost, and that it will require even further recovery time.

71. Welbourn has needed assistance toileting, showering, obtaining groceries, preparing meals, and being driven to appointments.

72. Welbourn has suffered economic injury in the form of direct medical bills, expenses, and lost wages.

73. Through September 2020, Welbourn was the Controller for Radisson Hotels in Nashua, New Hampshire. Welbourn's total compensation package (salary and benefits) of approximately $75,000 annually.

74. According to Salary.com, as of June 28, 2021, the average computer science salary in Boston, MA is $137,773.

75. Welbourn has been deprived of significant loss of enjoyment of life and will continue to be deprived of the same during his recovery.

76. Welbourn's injury will prevent him from other gainful and recreational activities for the remainder of his life.

## NO RESPONSE FROM DEFENDANTS

77. On March 25, 2021, Welbourn mailed a notice to preserve evidence to Roller World to preserve evidence, including but not limited to video evidence of the injury event, electronic customer lists, and records relating to rink maintenance.

78. The U.S. Postal Service delivered the notice to preserve evidence to Roller World.

79. Roller World did not respond.

80. Savino emailed Roller World to arrange a pick-up of Welbourn's hiking boots (which were believed to be left at Roller World's premises). Roller World did not respond.

81. On April 8, 2021, Welbourn wrote to Roller World, notifying Roller World of a potential claim and requesting insurance information. Roller World did not respond.

82. Welbourn wrote a follow-up to his previous letters, stating that if Roller World did not respond, then Welbourn would have to assume that Roller World is ignoring the injury. Roller World did not respond.

83. On June 25, 2021, Welbourn sent a formal demand letter on June 25, 2021 with 30 days to respond. However, Welbourn asked that Roller World *at least acknowledge* receipt of the letter within 10 calendar days. Roller World did not respond.

84. Defendants have demonstrated a pattern of indifference to Welbourn's injury, request for evidence preservation, insurance, and a notice of claim.

## COUNT I - PREMISES LIABILITY
## AGAINST ROLLER WORLD, INC. and CORTINA REALTY TRUST

85. All prior paragraphs are incorporated into this count.

86. The Defendants owed Welbourn a duty of care as an invitee to their business premises to prevent debris accumulation and to keep its floor in a safe condition to prevent injury.

87. When Breen was aware of unsafe conditions on the premises, Cortina Realty Trust had a duty to use reasonable care to correct any unsafe condition at the property within a reasonable time.

88. The Defendants failed to use reasonable care under all of the circumstances.

89. That Defendant's failure to use reasonable care was the proximate cause of Welbourn's injury.

90. The Defendants' negligence exceeds 50%. The Defendants' negligence is 100%.

91. Accordingly, Defendants are jointly and severally liable to Welbourn for damages.

## COUNT II - NEGLIGENCE
## AGAINST ROLLER WORLD, INC. and BREEN, individually

92. All prior paragraphs are incorporated into this count.

93. Roller World had a duty to maintain its roller rink in a manner known to avoid foreseeable injury.

94. Improperly maintained floors, uncleared debris on floors, and improperly maintained skates and inline skates which shed parts onto the floor are likely to cause foreseeable, serious injury to skates like Welbourn. Likewise, Roller World failed to warn that the roller rink needed maintenance and could contain debris.

95. Roller World breached that duty by failing to adequately maintain its skate surface.

96. Welbourn's fracture-before-falling injury is not the kind of injury that ordinarily occurs without some negligence of the rink operator in maintaining its skate rink.

97. Roller World's breach of its duty was a proximate cause of Welbourn's injury.

98. The Defendants' negligence exceeds 50%. The Defendants' negligence is 100%.

99. Accordingly, Defendants jointly and severally liable to Welbourn for the damages.

### COUNT III - NEGLIGENT SUPERVISION
### Against ROLLER WORLD, INC. and BREEN, individually

100.  All prior paragraphs are incorporated into this count.

101.  Defendants have a duty to train and supervise their employees on reasonable and safe methods of maintaining the skate rink floor which would prevent foreseeable injury to Roller World's invitees.

102.  Defendants have not trained their employees in a manner which exercises reasonable care.

103.  Breen does not regularly supervise his employees.

104.  The Defendants' breach of its duty was a proximate cause of Welbourn's injury.

105.  The Defendants' negligence exceeds 50%. The Defendants' negligence is 100%.

106.  Accordingly, Defendants jointly and severally liable to Welbourn for the damages.

## RELIEF REQUESTED

Plaintiff Drew Welbourn requests a money judgment from this Court against the Defendants, jointly and severally:

A. Damages, in an amount to be determined at trial, to include:

    a. Past and future medical expenses;
    b. Past and future pain and suffering;
    c. Past and future loss of income;

B. Punitive damages; and

C. Pre-judgment and post-judgment interest; and

D. Costs and expenses of suit and reasonable legal and attorneys fees, if any; and

E. Any other relief that this Court finds just and appropriate.

Respectfully submitted,

Plaintiff

Date: 7/15/2021

*/s/ Drew Welbourn*
Drew Welbourn
221 Douglas Street
Manchester, NH 03102
Phone: (323) 823-8866
Email: drew.welbourn@gmail.com

## JURY DEMAND

Plaintiff Drew Welbourn requests a jury trial.

Date: 7/15/2021

*/s/ Drew Welbourn*
Drew Welbourn